IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| RED EAGLE OIL, INC. | ) | Case No. 11-20857 |
| | ) | CHAPTER 11 |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S DISCLOSURE STATEMENT**

## I.　　INTRODUCTION

**A. Overview**

Pursuant to 11 U.S.C. § 1125, Red Eagle Oil, Inc. ("Debtor") submits this disclosure statement ("Disclosure Statement") to provide creditors, interest holders, and other parties in interest with adequate information so they will be able to make an informed judgment about the acceptability of the plan of liquidation ("Plan") filed contemporaneously herewith. The Disclosure Statement should contain sufficient information that would allow a hypothetical reasonable investor typical of the holders of claims and interests in the classes impaired under the Plan to make an informed judgment to accept or reject the Plan. This Disclosure Statement describes the Plan, explains Debtor's pre-bankruptcy operating and financial history, the events leading up to the commencement of Debtor's Chapter 11 case, significant events during its pending Chapter 11 case, and the anticipated results if the Plan is confirmed and becomes effective. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain alternatives to the Plan and the manner in which distributions will be made under the Plan. Lastly, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

The Plan is straightforward. As of the Effective Date of the Plan (as defined in Section 2.2 of the Plan), a Plan Agent (as defined in Section 2.1(u) of the Plan) will be appointed to administer all Estate Assets (as defined in Section 2.1(n) of the Plan) of the Debtor. A Post-Confirmation Plan Committee (as defined in Section 2.1(v) of the Plan) will be formed to assist the Plan Agent. The Plan shall be initially funded with the cash available to Debtor as indicated in paragraph III.(D).6. below. Said amount will be used to pay (if applicable): (a) allowed administrative expense claims; (b) priority tax claims; (c) United States Trustee fees ("UST Fees"); and, (d) an initial and final distribution to holders of allowed unsecured claims in Class 1.

B. Disclaimer

*No representations about Debtor, particularly about Debtor's future operations or the value of its property, are authorized by Debtor other than as set forth in this Disclosure Statement. Any representation or inducement made to secure an acceptance of the Plan other than as contained in this Disclosure Statement should not be relied upon by a creditor or interest holder. The information contained in this Disclosure Statement has not been subject to a certified audit. Further, the Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court may approve this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. You are urged to confer with your own counsel and a tax advisor about the Plan and Disclosure Statement.*

## II.    BACKGROUND

A. Description and History of Debtor's Business

Debtor, a Wyoming corporation, formerly known as Hinze, Inc., was formed in 1990. Debtor is owned by members of the Hinze family, including Dale Hinze (President of Debtor), Bryan Hinze (Vice-President of Debtor), Brad Hinze (Treasurer of Debtor), Scott Hinze (Secretary of Debtor) and Judith Hinze (Assistant Secretary) (collectively "the Officers"). In 1990, Debtor commenced operations by purchasing its first retail convenience store ("C-Store") in Ralston, Wyoming. In 1992, Debtor purchased one (1) wholesale plant, a Texaco distributorship and three (3) additional C-Stores. While Debtor "owned" the operation portion of each store, it only owned the land and buildings associated with two (2) of the C-Stores. The third store was owned by an outside entity (Debtor leased the retail operations of the store). In 1997, the land and building associated with the third store was purchased by Red Eagle, LC (a company owned by the Officers of Debtor). Debtor continued to lease this store from Red Eagle, LC.

In 1997, Debtor purchased its first fuel transport to begin selling fuel wholesale. The wholesale business began to grow, and in 1997, Debtor became an Exxon-branded distributor. In 2003, Debtor purchased multiple assets from Shell, consisting of the retail operations portion of multiple C-Stores. The land and buildings associated with these stores was purchased by Red Eagle, LC. In 2003, Debtor became a Cenex-branded distributor. Between 1997 and 2003, Debtor branded multiple Exxon, Shell and Cenex C-Stores. The wholesale side of Debtor was steadily growing, which allowed Debtor to purchase additional transports and trailers.

By the end of 2004, Debtor had acquired the retail operations portion of fifteen (15) C-stores which it still operated as of the Petition Date. Of the fifteen (15) C-Stores, Debtor only owned (as of the Petition Date) the land and buildings associated with two (2) of them. The land and buildings associated with the other thirteen (13) C-Stores was (as of the Petition Date)

owned by Red Eagle, LC.  In 2004, Debtor became more of a "common freight" transportation company, hauling condensate, crude oil and other oil field commodities.  As of the Petition Date, the transport distribution system consisted of approximately 26 transports (tractors) and 60 trailers.  The retail side of Debtor did not expand after 2004.  However, the wholesale (and distribution) side of the business grew exponentially, until approximately 2009, at which time the economy took a significant downturn.

### B. Insiders of Debtor

Persons and/or entities defined by the Bankruptcy Code as "insiders" of Debtor include its shareholders (Officers) and consist of: Dale Hinze (12.5%), Judith Hinze (12.5%) Bryan Hinze (25%), Brad Hinze (25%) and Scott Hinze (25%).  Red Eagle, LC is also an "insider" considering it is an "affiliate" of Debtor as that term is defined by the Bankruptcy Code.

### C. Management of Debtor Before and During the Bankruptcy

Debtor was operated at all times by its Officers until on or around January 1, 2013, at which time Dale Hinze, Judith Hinze and Brad Hinze obtained employment with another unrelated entity.  As of the date of this Disclosure Statement, Bryan Hinze and Scott Hinze are still actively involved in the management of Debtor.

### D. Events Leading to Chapter 11 Filing

In early 2009, Debtor began having difficulties collecting accounts receivable.  One account in particular was significant.  In an attempt to deal with this account, Debtor took on trade (from the entity with the outstanding account receivable) a bulk plant in Buffalo, Wyoming (in hopes that the revenue Debtor would realize from operating the bulk plant would replace the account receivable it could not collect).  The revenue generated from the bulk plant was not sufficient to replace the capital that would have otherwise been received had Debtor been paid

the account receivable (the bulk plant was still operating on the Petition Date, but on a limited basis, and was used in connection with the transportation side of the business). The downturn in the economy and the uncollectability of certain accounts receivable created a cash-flow problem. Debtor began factoring some of its accounts receivable to maintain operating cash-flow as a short-term fix. The expense of factoring ultimately led to Debtor no longer being able to cash-flow its business. In April of 2011, Debtor was no longer in a position to factor its accounts receivable, and consequently, it did not have sufficient capital to pay its vendors. Between April and June of 2011, Debtor stopped distributing gas to its branded retailers. Debtor began purchasing fuel solely to stock the fifteen (15) C-Stores it operated. Additionally, the transportation side of the business became "common carrier" freight only. The culmination of these events resulted in Debtor being unable to satisfy its accounts payable, and ultimately, Debtor was sued by multiple entities. On August 1, 2011, the Debtor filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Wyoming ("Court") to preserve the value of the estate and its assets, and to reorganize its affairs.

E. **Significant Events During the Bankruptcy Case**

Early on in its bankruptcy case, Debtor obtained the consent of its secured creditor, Pinnacle Bank – Wyoming, in order to use its cash collateral. Said consent continued through the duration of the case until Pinnacle Bank – Wyoming's claim was paid in full in December 2012. A committee of unsecured creditors ("Committee") was formed, and Lindquist & Vennum, LLP was retained by the Committee on October 19, 2011. Directly after the Petition Date, Debtor determined that it was in the best interests of its estate to retain a financial advisor to assist it with the liquidation of a substantial portion of its assets. Matrix Private Equities, Inc. ("Matrix") was retained for this purpose on January 1, 2012. That same day, the Plan Agent, r²

advisors, llc, was retained to serve as Debtor's Chief Financial Advisor to, among other tasks, consult on plans for the liquidation of Debtor's assets, consult with Debtor's management to insure that Debtor would receive the highest and best price for any assets Debtor liquidated, and to serve as the principal contact with the Committee and Debtor's creditors with respect to Debtor's financial and operational matters.

On April 10, 2012, the Court approved bidding and auction procedures for the sale of substantially all of Debtor's assets. From this date until on or around June 8, 2012, Matrix marketed Debtor's assets. On June 8, 2012, Debtor sought the approval of the sale of substantially all of its assets to Brad Hall & Assoc., Inc. for the combined purchase price of $9,450,000.00 ("Hall Sale"). The Hall Sale was approved by the Court on September 12, 2012. On December 12, 2012, the Hall Sale closed and the Debtor's bankruptcy estate netted approximately $1,231,703.51 after paying certain approved administrative claims, the fees of Matrix and all secured claims.

### F. Projected Recovery of Avoidable Transfers

The Plan Agent will have the ability to pursue all possible preference, fraudulent conveyance, or other avoidance actions as discussed in more detail below. The recovery of any possible actions is unknown, but Debtor has identified possible actions to pursue after the Plan is confirmed.

### G. Claims Objections

Except to the extent a Claim (as defined in Section 2.1(h) of the Plan) is already allowed pursuant to a final non-appealable order, the Plan Agent will have the right to object to Claims. Therefore, even if your Claim is Allowed (as defined in Section 2.1(b) of the Plan) for voting purposes, you may not be entitled to a distribution if an objection to your Claim is later upheld.

The procedures for resolving disputed Claims are set forth in Article 6 of the Plan.

### H. Current and Historical Financial Conditions

Debtor's most recent financial statements issued before its bankruptcy case was filed are set forth in Exhibit A. Debtor's most recent post-petition operating report filed since the commencement of the bankruptcy case is set forth in Exhibit B.

### I. Debtor's Property and Its Value

Debtor's principal assets consist of cash, accounts receivable and possible avoidance actions.

## III. Summary of the Liquidating Plan and Treatment of Claims and Equity Interests

### A. The purpose of the Liquidating Plan

As required by the Bankruptcy Code, the Plan places Claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, Debtor has not placed the following claims in any class:

*Administrative Claims, Priority Tax Claims and UST Fees*

Administrative Claims (as defined in Section 2.1(a) of the Plan) are costs or expenses of administering Debtor's Chapter 11 case which are Allowed under 11 U.S.C. § 507(a)(2) of the

Code. Priority Tax Claims (as defined in Section 2.1(w) of the Plan) are those Allowed under 11 U.S.C. §§ 502 and 507(a)(8). UST Fees are those fees required to be paid by 28 U.S.C. §1930(a)(6). All Allowed Administrative Claims, Allowed Priority Tax Claims and UST Fees will be paid in full on the Effective Date of this Plan. Debtor believes that there are no Priority Tax Claims.

The following chart lists Debtor's estimated Administrative Claims and UST Fees and their proposed treatment under the Plan:

| CLAIMS | ESTIMATED AMOUNT | PROPOSED TREATMENT |
|---|---|---|
| Committee Counsel Fees<br><br>Lindquist & Vennum, LLP | $50,000.00 | Paid in full on the Effective Date of the Plan* |
| CRA Fees<br><br>r² advisors, llc | $25,000.00 | Paid in full on the Effective Date of the Plan* |
| Debtor Counsel Fees<br><br>Winship & Winship, PC | $8,000.00 | Paid in full on the Effective Date of the Plan* |
| UST Fees | $0 | Paid in full on the Effective Date of the Plan |
| * If not approved by a non-appealable order, claimant must seek approval within thirty (30) days after the Effective Date of the Plan or such Claim will be forever barred and discharged. |||

**C. Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

*Class 1: General Unsecured Claims*

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under 11 U.S.C. § 507(a). Class 1 contains all Allowed unsecured Claims. The

following chart lists Debtor's estimated unsecured Claims and their proposed treatment under the Plan:

| CLASS | ESTIMATED AMOUNT | PROPOSED TREATMENT |
|---|---|---|
| Class 1: General Unsecured Claims | $10,440,817 (scheduled amounts plus secured deficiencies) | Class 1 shall be paid a pro rata share with all other Allowed unsecured Claims on the Initial Unsecured Distribution (Section 8.2 of the Plan) date and the Final Unsecured Distribution (Section 8.3 of the Plan) date. Class 1 is impaired under the Plan. |

*Class 2: Equity Interests*

Class 2 contains the Claims against Debtor's estate held by the shareholders/Officers of Debtor. The equity interests in Debtor shall be cancelled and receive no distribution under the Plan. Class 2 is impaired under the Plan.

### D. Means of Implementing the Plan

#### 1. Implementing Actions

Upon Court approval and confirmation of this Plan, this Plan shall be implemented and the following actions shall occur:

(a) Between the Confirmation Date (as defined in Section 2.1(j) of the Plan) and the Effective Date, Debtor's existing management will continue to manage the affairs of and operate Debtor. During this period, Debtor may pay all expenses incurred in the ordinary course of business and any Administrative Claims approved by the Court;

(b) On the Effective Date, the Plan Agent will begin serving pursuant to this Plan;

(c) On the Effective Date, Debtor shall transfer all Estate Assets (as defined in Section 2.1(n) of the Plan) to the Plan Agent free and clear of all liens, liabilities, Claims and interests. The Plan Agent will act on behalf of Debtor if the Debtor no longer manages its affairs at the time of transfer;

(d) The Plan Agent shall administer the Plan and shall hold and dispose of the Estate Assets in accordance with the provisions of this Plan; and,

(e) The Plan Agent shall carry out its responsibilities under the Plan.

**2. Initial Distribution**

On the Initial Distribution Date, up to seventy five percent (75%) of the Estate Assets shall be distributed in the following order:

(a) First, to pay the Allowed Administrative Claims, with any excess paid as distributions to Allowed unsecured Claims.

(b) Second, to pay the Priority Tax Claims and UST Fees (if applicable), with any excess paid as distributions to Allowed unsecured Claims.

(c) Third, the remaining balance of up to the 75% in pro rata shares, to the holders of Allowed unsecured Claims in Class 1 (the "Initial Unsecured Distribution").

**3. Final Distribution**

On or before two (2) years after the Effective Date, the Plan Agent shall distribute all remaining Estate Assets, less any outstanding fees and/or expenses of the Plan Agent or any accountant, consultant, attorney or professional employed by the Plan Agent after the Effective Date, in pro rata shares to holders of Allowed unsecured Claims in Class 1 (the "Final Unsecured Distribution").

**4. Officers**

From and after the Confirmation Date and until the Effective Date, the Officers of Debtor that serve prior to the Confirmation Date shall continue to serve as such.

### 5. Plan Agent

r² advisors, llc (r²) will be the Plan Agent, and will perform its duties in compliance with the provisions of this Plan. The Debtor will transfer all Estate Assets to the Plan Agent as discussed in the Plan. r² will be paid $350.00 per hour. The Plan Agent will act on behalf of the Debtor and in consultation with the Post-Confirmation Plan Committee after the Effective Date, and its duties will include, but not be limited to: (1) executing requisite documents; (2) transferring any remaining property and money on behalf of the Debtor in compliance with the Plan; (3) pursuing possible Avoidance Actions (as defined in Section 2.1(c) of the Plan) and/or Claim objections; and, (4) retaining professionals to assist in implementing its duties and responsibilities under the Plan.

### 6. Plan Funding

As of April 12, 2013, Debtor has cash on hand of approximately $1,248,919.44. Said funds will be used to fund the Plan.

### E. Risk Factors

Debtor has not identified any risk factors.

### F. Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases are rejected by the Debtor as of the Effective Date.

### G. Tax Consequences of Plan

*Creditors and equity interest holders concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.*

THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN MAY

HAVE TAX AND SECURITIES LAW IMPLICATIONS.  HOLDERS OF THE CLAIMS AND INTERESTS ARE URGED TO OBTAIN INDEPENDENT ADVICE FROM THEIR OWN COUNSEL REGARDING THE APPLICABILITY OF FEDERAL AND STATE TAX AND SECURITIES LAWS.

THE FOREGOING SUMMARY OF THE PLAN DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF EACH HOLDER'S PARTICULAR CIRCUMSTANCES AND INCOME TAX SITUATION.  HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR ANY PURPOSE; (B) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS INCLUDED IN CONNECTION WITH THE PLAN ONLY; AND, (C) EACH HOLDER OF A CLAIM OR INTEREST SHOULD SEEK ADVISE FROM AN INDEPENDENT TAX ADVISOR.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO HOLDERS OF CLAIMS AND INTERESTS WILL DEPEND ON, AMONG OTHER THINGS: THE ORIGIN OF EACH HOLDER'S CLAIM OR INTEREST, WHEN THE CLAIM BECOMES AN ALLOWED CLAIM, WHEN THE HOLDER RECEIVES A PAYMENT ON ACCOUNT OF AN ALLOWED CLAIM, WHETHER THE HOLDER REPORTS INCOME USING THE ACCRUAL OR CASH METHOD OF ACCOUNTING, WHETHER THE HOLDER HAS TAKEN A BAD DEBT DEDUCTION OR WORTHLESS SECURITY DEDUCTION WITH RESPECT TO THE CLAIM, AND WHETHER THE CLAIM CONSTITUTES A "SECURITY" FOR FEDERAL INCOME TAX PURPOSES.

THE FOREGOING IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX ASPECTS OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE FROM INDEPENDENT TAX PROFESSIONALS.  HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN.

## IV.    CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in 11 U.S.C. §§ 1129(a) or (b).  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired Class of Claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are not the

only requirements listed in 11 U.S.C. § 1129, and they are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met. Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a Claim or equity interest that is both (1) Allowed or Allowed for voting purposes and (2) impaired.

In this case, Debtor believes that Classes 1 and 2 are impaired and that holders of Allowed Claims or Claims Allowed for voting purposes in each of these Classes are therefore entitled to vote to accept or reject the Plan.

### 1. What Is an Allowed Claim or an Allowed Equity Interest?

Only a creditor or equity interest holder with an Allowed Claim or an Allowed equity interest has the right to vote on the Plan. Generally, a Claim or equity interest is allowed if either (1) the Debtor has scheduled the Claim on the Debtor's schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a Claim or equity interest is not allowed, the creditor or equity interest holder holding the Claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the Claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

*The deadline for filing a proof of claim in this case expired on December 7, 2011.*

*The deadline for filing objections to claims is sixty (60) days after the Effective Date of the Plan.*

### 2. What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an Allowed Claim or equity interest has the right to vote only if it is in a Class that is impaired under the Plan. As provided in 11 U.S.C. § 1124, a Class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that Class.

### 3. Who is Not Entitled to Vote

The holders of the following five types of Claims and equity interests are not entitled to vote:

- holders of Claims and equity interests that have been disallowed by an order of the Court;

- holders of other Claims or equity interests that are not "Allowed Claims" or Allowed equity interests, unless they have been "Allowed" for voting purposes.

- holders of Claims or equity interests in unimpaired Classes;

- holders of Claims entitled to priority pursuant to 11 U.S.C. §§ 507(a)(2), (a)(3), and (a)(8);

- holders of Claims or equity interests in Classes that do not receive or retain any value under the Plan; and,

- Administrative Claims.

*Even if you are not entitled to vote on the Plan, you have a right to object to the confirmation of the Plan.*

### B. Votes Necessary to Confirm the Plan

If impaired Classes exist, the Court cannot confirm the Plan unless (1) at least one impaired Class of creditors has accepted the Plan without counting the votes of any insiders within that Class, and (2) all impaired Classes have voted to accept the Plan, unless the Plan is

eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in B.2.

### 1. Votes Necessary for a Class to Accept the Plan

A Class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan.

A Class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed equity interests in the Class, who vote, cast their votes to accept the Plan.

### 2. Treatment of Nonaccepting Classes

Even if one or more impaired Classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner prescribed by 11 U.S.C § 1129(b). A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of 11 U.S.C § 1129(a)(8), does not "discriminate unfairly," and is "fair and equitable" toward each impaired Class that has not voted to accept the Plan.

*You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

### C. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such Claim and equity interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached to this Disclosure Statement at Exhibit C. Under this analysis, the Debtor assumes that there will be no other assets to distribute other than the cash Debtor currently has in its possession.

The liquidation analysis on Exhibit C provides that distribution through the Plan will be more efficient and less expensive than converting the case to a Chapter 7 and having it administered by a trustee. Conversion of a case to Chapter 7 carries inherent additional costs and duplication of effort and would severely reduce the value of the Debtor's assets.

### D. Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation is proposed in the Plan. This is a liquidating plan.

## V.     EFFECT OF CONFIRMATION OF PLAN

### A. No Discharge of Debtor

In accordance with 11 U.S.C. § 1141(d)(3), Debtor will not receive any discharge of debt in this bankruptcy case.

### B. Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan. The Debtor, through the Plan Agent, may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C. Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, through the Plan Agent, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

Dated: May 3, 2013

                                        RED EAGLE OIL, INC.

                                        By:__/s/_____
                                          Bryan Hinze, Vice-President

**APPROVED AS TO FORM:**

_____/s/_____
Red Eagle Oil, Inc.
By: Bradley T. Hunsicker

_____/s/_____
Official Unsecured Creditors' Committee
By: John C. Smiley